# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

LORI ANNE SMITH,       )    CIVIL ACTION NO. 9:16-2761-RMG-BM
                      )
          Plaintiff,    )
                      )
v.                      )    **REPORT AND RECOMMENDATION**
                      )
COMMISSIONER OF SOCIAL    )
SECURITY ADMINISTRATION,    )
                      )
          Defendant.    )
_____)

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner wherein she was denied disability benefits. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) on February 5, 2009 (January 30, 2009 /protective filing date), alleging disability beginning October 6, 2004 due to a neck injury received in an automobile accident on that date, as well as anxiety and high blood pressure. (R.pp. 96, 117-118). Plaintiff's claim was denied both initially and upon reconsideration.[1] Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), which was held on July 8, 2010. (R.pp. 19-34). The ALJ thereafter denied Plaintiff's claim in a decision issued August 11, 2010.

---

[1] Plaintiff had previously sought disability from the Social Security Administration as a result of this injury, but those applications were also denied at the initial and reconsideration levels. See (R.p. 105).




(R.pp. 10-18). The Appeals Council denied Plaintiff's request for a review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (R.pp. 1-5).

Plaintiff thereafter sought judicial review in this Court, and in an Order filed June 22, 2012, the decision was reversed and remanded for a full evaluation of the opinions of Dr. Nancy Lembo as a treating specialist physician and to determine whether they support a finding of disability during the insured status period,[2] for the purpose of obtaining Vocational Expert testimony to establish whether Plaintiff could perform other work with her exertional and non-exertional limitations during the relevant time period, as well as for any further administrative action as was necessary or appropriate. (R.pp. 462-477); see also Hancock v. Barnhart, 206 F.Supp.2d 757, 763-764 (W.D.Va. 2002)[On remand, the ALJ's prior decision has no preclusive effect, as it is vacated and the new hearing is conducted de novo]. A second administrative hearing was then held February 14, 2013; (R.pp. 479-501); following which the ALJ issued a decision on March 20, 2013 again finding that the Plaintiff was not entitled to disability benefits. (R.pp. 442-452).

Plaintiff thereafter again sought judicial review in this Court, and in an Order filed August 12, 2014, the decision was reversed and remanded a second time for a full inquiry of Plaintiff's financial condition, insurance coverage, and resources at the time in question and to avoid discrediting Plaintiff's pain complaints and general credibility if her failure to pursue follow up pain treatment was caused by a lack of financial resources; a careful review and consideration of Dr.

---

[2]For purposes of DIB eligibility, a claimant must show that he or she became disabled prior to the expiration of his or her insured status. See 42 U.S.C. § 423(c); 20 C.F.R. § 404.101 (2009). Here, Plaintiff's eligibility for DIB expired on March 31, 2008. Therefore, in order to be found eligible for disability benefits, Plaintiff must show that her impairments became disabling by no later than that date.



2

Campbell's care and treatment in assessing Plaintiff's credibility regarding her pain symptoms; recognition of the consistent presence of cervical spinal cord contact from 2004 forward and assessment of Plaintiff's credibility regarding pain in light of the well documented radiographic findings; and evaluation of Dr. Rawe's opinions regarding weight lifting restrictions under the Treating Physician Rule and for the ALJ not to substitute his/her opinions for those of the medical experts, and to determine whether these considerations support a finding of disability during the insured period. (R.pp. 684-696). A third administrative hearing was then held June 23, 2015 before a different ALJ; (R.pp. 640-659); following which this ALJ issued a decision on July 29, 2015, again finding that the Plaintiff was not entitled to disability benefits. (R.pp. 619-634). The Appeals Council subsequently denied Plaintiff's request for review. (R.pp. 606-610).

Plaintiff then filed this action in United States District Court, asserting that there is not substantial evidence to support the ALJ's decision, and that the decision should be reversed and remanded for further consideration, or for an outright award of benefits. The Commissioner contends that the decision to deny benefits is supported by substantial evidence, and that Plaintiff was properly found not to be disabled.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial



evidence to support the Commissioner's decision, it is the court's duty to affirm the decision.

Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Noting that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by substantial evidence." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

### Discussion

A review of the record shows that Plaintiff, who was forty-three (43) years old when she alleges she became disabled, has a high school education with past relevant work experience as a drywall finisher and school bus driver. (R.pp. 126-127, 472, 529, 540). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that she has an impairment or combination of impairments which prevented her from engaging in all substantial gainful activity for which she was qualified by her age, education, experience and functional capacity, and which lasted or could reasonably be expected to last for at least twelve (12) consecutive



4

months. After a review of the evidence and testimony in this case, the ALJ determined that, although Plaintiff does suffer from the "severe" impairment[3] of cervical degenerative disc disease, thereby rendering her unable to perform any of her past relevant work during the relevant time period, she nevertheless retained the Residual Functional Capacity (RFC) to perform a reduced range of sedentary work through her date last insured (March 31, 2008),[4] and is therefore not entitled to disability benefits. (R.pp. 625-626, 632-634).

Plaintiff asserts that in reaching this decision, the ALJ erred by improperly assessing Plaintiff's credibility. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d 640 [Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

# I.

## (Medical Record)

The record reflects that Plaintiff was in an automobile accident on October 6, 2004 (her disability onset date), following which she was transported by EMS to the Trident emergency room for evaluation. A medical report indicates she did not lose consciousness as a result of this

---

[3]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a); Bowen v. Yuckert, 482 U.S. 137, 140-142 (1987).

[4]Sedentary work is defined as lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).



accident, but complained in the ER of having a headache and pain in her right shoulder and neck as well as her arm. Plaintiff had an x-ray performed, which showed no fractures of the neck or shoulder, as well as a CT scan of her head, which was normal. She subsequently underwent an MRI scan of her neck on November 8, 2004, which showed small central disc protrusions at C4-5 and C6-7 and also on the saggital tucks of C1-2. (R.p. 168). See also (R.pp. 184-185, 191-192, 198-199). Plaintiff thereafter went to see a chiropractor (D. R. Dove-Kidd) and a physical therapist (Rebecca English) for complaints of pain. (R.pp. 193-195, 197, 203-205).

On November 23, 2004 (about six (6) weeks post-accident), Plaintiff was seen by Dr. Dowse Rustin for an evaluation on referral from her attorney. Plaintiff complained to Dr. Rustin of moderate tenderness in the right paracervical musculature and upper border of the trapezius bilaterally, especially on the right, but on examination Dr. Rustin found no neurological deficits, her pulses were good, and her motor function was normal. Dr. Rustin recommended that Plaintiff be seen by a neurosurgeon or spine specialist for her complaints, and opined that if Plaintiff was completely cleared by a neurosurgeon or spine specialist, he would rate her as having a six percent permanent impairment. (R.pp. 168-169).

Plaintiff went to see Dr. Stephen Rawe on January 17, 2005 for a consultation for complaints of neck pain. Plaintiff told Dr. Rawe that while her low back pain had significantly improved, she still had posterior cervical and left paraspinous muscle pain with occasional pain radiating down the left upper extremity to the forearm accompanied by numbness of the tips of both fingers, with the right side being worse than the left. Dr. Rawe reported that a review of systems

indicated that Plaintiff had no gait disturbance, headaches, diplopia,[5] or dysarthria,[6] and on examination Plaintiff was found to be well nourished and in no significant distress, her neck was supple, she had good peripheral pulsations, her psychiatric mood and affect were appropriate, and there were no problems noted with Plaintiff's attention span, memory or knowledge. A neuromuscular examination revealed only a mildly restricted range of motion of the cervical spine with no significant muscle spasm, Plaintiff had good range of motion of the low back, there was no obvious weakness of the upper and lower extremity muscle groups, deep tendon reflexes were symmetrical and equal, she had a non-dermatomal hypalgesia of the entire left hand, and sensation in Plaintiff's lower extremities was intact. Dr. Rawe reviewed Plaintiff's spine films and recommended that she have flexion and extension views taken of the cervical spine, that she continue taking her Darvocet and Naproxen, and use a soft cervical collar. She was to return in two weeks. (R.pp. 286-287).

Plaintiff thereafter returned to see Dr. Rawe on February 1, 2005. She complained to Dr. Rawe that her posterior cervical discomfort was aggravated by working with her hands above her head. Dr. Rawe noted she was taking her Darvocet (a pain medication) only "intermittently", and an examination revealed no obvious weakness, reflex, or sensory abnormalities in the upper extremities and no findings to indicate myelopathy. Various treatment options were discussed,

---

[5]Diplopia is the perception of 2 images of a single object (double vision. http://www.merckmanuals.com/professional/eye_disorders/symptoms_of_ophthalmologic_disorders/diplopia.html. November 2012.

[6]Dysarthria is a condition in which you have difficulty controlling or coordinating the muscles you use when you speak, or weakness of those muscles, characterized by slurred or slow speech. http://www.mayoclinic.org/diseases-conditions/dysarthria/basics/definition/con-20035008 May 24, 2012.



which Plaintiff indicated she would consider. (R.pp. 288-289).

On February 14, 2005, Dr. Rawe opined to Plaintiff's attorney that she would most likely have a fifteen (15%) percent impairment of her cervical spine, with work restrictions that would include not working with her hands up over her head for a long period of time and bending her neck backwards. Otherwise, Dr. Rawe opined that Plaintiff did not have any lifting restrictions regarding her neck, and had only minimal restrictions with respect to climbing. (R.p. 307). Dr. Rawe further opined that Plaintiff had a "strong option to consider anterior cervical diskectomy and interbody fusion at the cervical C5-6 level", and his office notes reflect that Plaintiff was seen by RN Cindy Anderson of his office on March 22, 2005, and indicated that she was interested in surgical intervention but not until her case was settled, because she had no insurance. An examination performed at that time revealed no weakness of the upper extremity muscle groups, and her bicep and tricep reflexes were "present". (R.p. 289).

On April 29, 2005, Plaintiff underwent a psychological and vocational evaluation by Dr. Robert Brabham. Plaintiff drove to the appointment, but advised Dr. Brabham that she generally limited her driving due to neck and shoulder pain and discomfort experienced while driving. Dr. Brabham reviewed Plaintiff's medical records from several sources and performed a number of tests. Plaintiff advised that, since her accident, she was no longer able to perform any heavy chores such as mopping or sweeping, cleaning the swimming pool, or tending to her rose bushes or cutting the grass, instead limiting herself to 'light chores around the house". Plaintiff further reported that she experienced muscle spasms in her neck and shoulders when she exerts herself too much, and spent about four hours resting or reclining during a typical eight hour day. Dr. Brabham stated that



8

Plaintiff appeared credible in her descriptions of her condition, and opined that she was unable to engage in any "gainful work activity involving working with her hands up over her head for a long period of time and bending her neck backwards. She also has restrictions on climbing and reaching : . . ." (R.p. 220). However, he further opined that "if she were provided the surgery as recommended by her physicians, it is possible that her condition could improve to the point where she could continue her career in her drywall business, but as a manager, rather than as the primary laborer". Id. see generally, (R.pp. 214-221).

On May 24, 2005, Plaintiff was admitted to St. Francis Hospital for her recommended cervical spine surgery. Upon admission to the hospital, Plaintiff received a comprehensive examination which revealed a well nourished female in no significant distress. Plaintiff's neck was supple, there were no carotid bruits, her extremities had good peripheral pulsation, she had only a mildly restricted range of motion of the cervical spine on hypertension with no significant muscle spasm, she had a good range of motion of the lower back with no obvious weakness of upper and lower extremity muscle groups, her deep tendon reflexes were symmetrical and equal, she had diminished sensation of the left thumb, and there were no findings to indicate a myelopathy. Plaintiff was assessed with cervical spondylosis C5/6 with possible mild spinal instability, and her treatment options were outlined with her. (R.pp. 295-297). Dr. Rawe thereafter performed an interior cervical diskectomy and interbody fusion with structured allograft and interior spinal plating by synthes at C5-C6. Plaintiff tolerated the procedure well. (R.pp. 298-300).

On June 1, 2005 (one (1) week post-surgery), Dr. Rawe noted that Plaintiff's incision cite was healing well, there were no signs of any drainage, and she was not running any fever. While Plaintiff was still complaining of some pain, Dr. Rawe advised her that that was not unusual

9

following this type of surgery and considering the length of time she had had this problem. He recommended Plaintiff take some Ibuprofen. (R.p. 290). By June 28, 2005, it was noted that Plaintiff's left arm pain had improved and was at that point only "intermittent", and while she still complained of a moderate amount of neck pain and exhibited a restricted range of motion of the cervical spine on right lateral rotation and hyperextension, her biceps and triceps strength was normal, she had good deltoid strength, and good intrinsic hand strength. Dr. Rawe opined that Plaintiff had no obvious weakness or reflex abnormalities in her upper extremities, that her incision cite was well healed, and that most of her pain was related to hyperextending her neck while inspecting job sites. (R.p. 291). An x-ray of Plaintiff's cervical spine taken August 9, 2005 showed Plaintiff's fusion to be well positioned and stable. (R.p. 302). Plaintiff began a course of physical therapy.

Dr. Rawe's notes reflect little change in Plaintiff's condition from August 15 to September 20, 2005. (R.pp. 226-230).[7] When Plaintiff returned to see Dr. Rawe on October 18, 2005, she reported that her left arm pain had markedly improved, but that she still had some paresthesis in her left arm. Plaintiff's main complaint that day was neck pain, reporting that she had "pretty moderate pain" if she attempted to "dry wall" or drive. Plaintiff also complained of a lot of "other issues" on that visit, including depression and sexual dysfunction. Dr. Rawe ordered some x-rays, which showed no obvious instability in Plaintiff's cervical spine, that the fusion process appeared to be consolidated well, and that her anterior spinal plate was in good position. Although Dr. Rawe offered Plaintiff some cervical epidurals for her pain complaints, Plaintiff said she was

---

[7]His progress notes from August 30, 2005 do note that Plaintiff reported she had "slipped" the previous Saturday, resulting in her being "very sore x 3 days". (R.p. 229).



"not interested". (R.p. 292).

In a letter dated November 21, 2005, Dr. Rawe told Plaintiff's attorney that, although future surgery is sometimes required in these types of cases, he did not anticipate any further operative procedures regarding Plaintiff's cervical spine. Dr. Rawe opined in this letter that Plaintiff had a fifteen (15%) percent impairment of the cervical spine and to the whole body a result of the automobile accident, with permanent restrictions of working with her hands up over head for excessive periods of time and excessive hyperextension of the cervical spine. He further opined that Plaintiff did not have any lifting restrictions. (R.p. 309).

Plaintiff returned to see Dr. Rawe on January 31, 2006, at which time she reported that she was able to go to the fitness center twice a week and had been working out. However, she advised that with "moderate amount of activities around the house" she still had neck pain and some pain in her left arm with residuals. On examination Plaintiff's left biceps were found to be reduced compared to the right, and she complained of pain on range of motion of the cervical spine on all maneuvers as well as of pain on range of motion of the left shoulder. Both triceps reflexes were present, however, and she had no weakness of the upper extremity muscle groups. Dr. Rawe noted that he had placed permanent restrictions on Plaintiff from working with her hands up over her head and from excessive bending of the neck, but otherwise he believed she was able to do other types of employment. He also advised on this occasion, however, that Plaintiff should avoid lifting more than fifteen pounds maximum, and that although she could lift ten pounds frequently, she should not do any repetitive lifting. On February 11, 2006, an MRI was also ordered, which indicated no recurrent disc at C5-6, with a mild adjacent segment disease at C4-5, which appeared to be



11

"minimal". (R.p. 293).[8]

On April 27, 2006 Plaintiff met with professional rehabilitation counselor Kathy Willard at her lawyer's request. Willard performed a rehabilitation assessment; (R.pp. 240-245); and reported to Plaintiff's attorney that, based on Dr. Rawe's permanent restriction on Plaintiff's ability to work overhead and to engage in bending of the neck, Plaintiff would be unable to return to her pre-injury occupation. Willard presented a rehabilitation plan that she stated would only be successful "if there is a significant reduction in [Plaintiff's] pain". She further stated that she thought Plaintiff was "disabled" from those occupations for which she had training, and that the probability of vocational rehabilitation success was "guarded". (R.p. 239).

Plaintiff thereafter returned to Dr. Rawe on July 18, 2006, where on examination she exhibited a restricted range of motion of the cervical spine on hyperextension. She also had diminished sensation to the right thumb and index finger, but had no findings to indicate myelopathy, she had no weakness in her upper extremity muscle groups, and her biceps and triceps reflexes were "present". Dr. Rawe noted that Plaintiff's last MRI scan demonstrated only mild changes at C4-5 which appeared to be "minimal", and she did not have a recurrent disc at C5-6. He advised Plaintiff that she could consider cervical epidural steroid injections for her continued complaints of neck and posterior cervical discomfort. (R.p. 294).

Plaintiff first presented to Dr. Nancy Lembo on March 7, 2007 (eight (8) months after

---

[8] The Court noted in its Order reversing Plaintiff's previous case that this MRI along with the other three MRIs in the record documented "the presence of abnormalities in Plaintiff's cervical spine (disc protrusion or osteophytes) that were in contact with [Plaintiff's] spinal cord." See Order filed on August 12, 2014 (Civil Action No. 9:13-cv-1993). The ALJ's discussion of this issue on remand is set forth and evaluated, infra.



her last visit to Dr. Rawe). Dr. Lembo noted Plaintiff's previous surgery and that she was there for further evaluation of her symptoms. Plaintiff was observed to be well developed, well nourished with an appropriate affect and orientation, and "slightly emotionally well". She had a normal gait, could toe walk and heel walk, and had fairly good balance. With respect to her cervical spine range of motion, Plaintiff was seventy five (75%) percent restricted in extension, fifty (50%) percent restricted in rotation, but had full forward flexion. Her thoracic spine range of motion was symmetrical in rotation, although she did have some point tenderness in the midline of the thoracic spine from the T3-T6 area. Plaintiff's reflexes were symmetrical, there was no evidence of clonus, and she had 5/5 (full) motor strength. Although Plaintiff exhibited restricted active range of motion and abduction to approximately ninety degrees to the shoulders, examination of her upper extremities did not reveal any atrophy or fasciculation. (R.pp. 265-266).

Plaintiff returned to see Dr. Lembo a few weeks later, at which time she was noted to be "well-developed" with an appropriate affect. Examination of the upper extremities again revealed no evidence of atrophy or fasciculation, and she had 5/5 (full) motor strength in her upper extremities. Plaintiff also denied any weakness, although she stated that she was "extremely frustrated" with her pain. Dr. Lembo also reviewed Plaintiff's February 2006 cervical spine MRI, noting that it evidenced Plaintiff's C5-6 diskectomy with fusion with a "questionable" central and foraminal narrowing, left greater than right. She also noted a C6-7 diffuse disc bulging with osteophytes. Dr. Lembo indicated she had discussed treatment options with the Plaintiff, including a diagnostic cervical facet joint injection, but that Plaintiff did not want to proceed with any



13

procedures that she would have to pay for. (R.pp. 263-264).[9]

Beginning in June, 2007, Plaintiff was seen by family practitioner Dr. Patricia Campbell of Springhill Family Practice. On June 5, 2007 Plaintiff presented complaining of neck pain. It was noted that Plaintiff's husband advised that she was taking no medications at that time. The only objective finding noted was "hernia" (although that may just be a shadow on the page copy). Dr. Campbell assessed Plaintiff with chronic neck pain, anxiety and obesity, and restarted Plaintiff on some medications. (R.p. 277). On what appears to be July 2, 2007 (the exhibit stamp partially obscures the date) Plaintiff complained of an increase in pain after doing "extra cleaning of [the] house". Several medications were listed. (R.p. 275). On October 8, 2007, Plaintiff complained that her pain medication was not working, with her pain having increased after she had "become more physically active". Plaintiff also complained that she was getting "real bad" depression. Plaintiff was diagnosed with chronic neck pain and high blood pressure.[10] (R.p. 273). On October 22, 2007 it was noted that Plaintiff's pain was "better". (R.p. 273). On what appears to be December 11, 2007 (again, the exhibit stamp partially covers the date), Dr. Campbell noted Plaintiff's medication regimen and recorded the comment that Plaintiff was "able to function in the a.m. [without] pain medications". Plaintiff was also noted on this visit to be "smiling" and in "no acute distress", and she told Dr. Campbell that she was in the process of planning a visit to Florida. (R.p. 271).

---

[9]As was noted by the Court in its Order reversing the decision in Plaintiff's previous case, a claimant's failure to obtain medical treatment that she cannot afford cannot justify an inference that her condition was not as serious as she alleges. See Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986).

[10]It was noted Plaintiff was not taking her blood pressure medication.



On February 13, 2008, Plaintiff was seen again by Dr. Lembo. Plaintiff complained of increasing pain with radiation to the shoulder blade area as well as pain in her arms, and that she was unable to raise her arms above her head because of the pain. On examination Plaintiff was found to be well developed, well nourished, with a tearful and emotional effect, she had a non-antalgic or widened gait, and while she had a forward stooped posture, examination of the spine did not reveal a shift. She exhibited a fifty (50%) percent restriction in extension, forward flexion and rotation bilaterally, all of which resulted in complaints of neck pain. However, her reflexes were symmetrical throughout, Hoffmann's testing[11] was negative, there was no evidence of clonus, and although she was not able to reach full range of motion of the shoulder, she had full (5/5) motor strength. Dr. Lembo recommended an x-ray of the thoracic spine to rule out any interval pathology contributing to her pain, and that Plaintiff continue with her medication regimen. (R.pp. 261-262).

Plaintiff continued thereafter to be seen intermittently by Dr. Campbell through June, 2008, with her complaints including insomnia. By June 10, 2008, Plaintiff's diagnoses were generally unchanged, with Plaintiff being noted by Dr. Campbell to be in "no acute distress". (R.pp. 268-270).

The record then contains a report from Dr. Rawe dated March 1, 2009 in which he states that he "discussed the results of [Plaintiff's] MRI scan of the cervical spine with her, which does not appear to demonstrate any obvious new changes such as adjacent segment disease that

---

[11]The Hoffmann sign is used by examiners assessing patients with symptoms of myelopathy. The test is done by quickly snapping or flicking the patient's middle fingernail. The test is positive for spinal cord compression when the tip of the ring finger, and/or thumb suddenly flex in response. http://www.eorthopod.com/content/hoffmann-sign-red-flag-for-cervical-myelopathy. September 2008.



additional surgery would be helpful for". (R.p. 284).[12] This was now almost a year after Plaintiff's

eligibility for DIB had expired. Plaintiff then returned to see Dr. Lembo on April 29, 2009, at which

time she was wearing a soft cervical collar on her neck. Her chief complaint was neck pain.

Plaintiff reported that she had recently been seen by Dr. Rawe, who had told her that even though

her fusion was not complete, he did not recommend further surgery.[13] Plaintiff also complained to

Dr. Lembo of lower back pain with symptoms of numbness and tingling into the left, and advised

that she had sustained a fracture of her left ankle while getting out of a pool in June 2008.[14] Dr.

Lembo again noted Plaintiff to be well developed, well nourished, and with an appropriate affect.

She also noted that Plaintiff was able to move without assistance and that her gait was not antalgic

or widened, but on examination Plaintiff displayed a seventy-five (75%) percent restriction in

extension, and fifty (50%) percent restriction in rotation bilaterally in her cervical spine range of

motion. She also displayed a twenty-five (25%) percent restriction in forward flexion and seventy-

five (75%) percent restriction in extension in her lumbar spine range of motion. Even so, her motor

strength continued to be 5/5, and although Plaintiff was noted to have a "hypersensitivity of both

the left upper and left lower extremity", an examination of both her upper and lower extremities did

not reveal any evidence of atrophy or fasciculation.

---

[12]This MRI was one of the four referenced by the Court in its previous Order that documented "the presence of abnormalities in Plaintiff's cervical spine (disc protrusion or osteophytes) that were in contact with [Plaintiff's] spinal cord." See Order filed on August 12, 2014 (Civil Action No. 9:13-cv-1993-RMG).

[13]However, there is nothing in Dr. Rawe's report of March 1, 2009 to support this statement. (R.p. 284).

[14]This was after Plaintiff's eligibility for DIB had expired on March 31, 2008.



16

Dr. Lembo indicated that she had also reviewed an MRI cervical spine report from February 24, 2009, which documented Plaintiff's previous diskectomy fusion at C5-6, a partial osseous union across the disc space, a "mild" artifact, with no residual or recurrent disk protrusion. There was a C4-5 focal left paracentral disk protrusion causing moderate central and left hemicord flattening, and a C6-7 broad based central disk osteophyte complex with mild facet arthropathy. Dr. Lembo stated that, even though Plaintiff had told her that Dr. Rawe had said there was some angulation of the screws from her surgery (a claim which, as previously noted, is not in fact supported by Dr. Rawe's records), she explained to the Plaintiff that there was no mention in the MRI of any angulation of the hardware, and that it appeared to be intact with partial fusion across the disc space. She also "reassured" the Plaintiff that while C4-5 disc herniation may cause some of her neck pain, this would "most likely" not be radiating down her arm. Treatment options were discussed, and Plaintiff indicated she would prefer to just continue with her Percocet prescription. (R.pp. 336-337).

Plaintiff returned to see Dr. Lembo on May 20, 2009, at which time she was noted to be well developed, well nourished, and with an appropriate affect. Examination of Plaintiff's upper extremities did not reveal any evidence of atrophy or fasciculation, there was no swelling or edema, and she was neurologically intact. (R.p. 339). Plaintiff thereafter underwent diagnostic testing on June 1, 2009, which found that Plaintiff had moderate right carpal tunnel syndrome affecting both the sensory and motor components across her right wrist, but no evidence of a radiculopathy, myopathy, or peripheral neuropathy. With respect to her neck symptoms, it was noted that this complaint appeared to be mechanical and myofascial in origin, and chiropractic treatment was recommended. (R.pp. 340-341). Plaintiff received the trigger point injection on June 10, 2009.



(R.p. 346).

On June 30, 2009, state agency physician Dr. Jean Smolka completed a Residual Functional Capacity Assessment for the Plaintiff after a review of her medical records, and opined that through the date Plaintiff was last insured (March 31, 2008), Plaintiff had the lifting capacity for medium work;[15] that she could stand and/or walk (with normal breaks) for about six hours in an eight hour work day; sit (with normal breaks) for about six hours in an eight hour workday; and that she had an unlimited ability (other than as noted for lifting and carrying) to push and/or pull. Dr. Smolka further opined that Plaintiff was limited in her ability to reach (including overhead), but otherwise had no manipulative limitations; that she could frequently perform all postural activities (except for climbing ladders/ropes/scaffolds and crawling, which she could only do occasionally); and she should avoid concentrated exposure to hazards such a machinery and heights. (R.pp. 327-334).

Plaintiff returned to see Dr. Lembo on July 20, 2009, where she was again noted to be well developed, well nourished with an appropriate affect. She had a normal gait, but exhibited a palpable tenderness in the cervical paraspinal musculature. Otherwise, her motor strength was 5/5, and it was noted that her cervical spine range of motion was "markedly improved" with restriction in extension and rotation to about twenty-five (25%) percent. (R.p. 249). On August 3, 2009, Plaintiff reported to Dr. Lembo complaining that something had snapped in the center of her neck about a week ago when she lifted a pan to pour liquid into a jar while helping to cook. Plaintiff complained of pain in her neck, but denied any arm symptoms. Plaintiff was again noted on

---

[15]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).



examination to be well developed, well nourished, and with a normal gait. Dr. Lembo also noted that Plaintiff exhibited "excessive guarding" in the cervicothoricic area with excessive scapular elevation. Plaintiff also exhibited a significantly restricted range of motion in her cervical spine on extension and rotation bilaterally, as well as a palpable trigger point in the cervical paraspinal muscles, right greater than left. However, her upper extremity range of motion was symmetrical without evidence of winging, her reflexes were symmetrical, she had motor strength of 4/5 with no evidence of clonus, and Hoffmann's testing was again negative. Plaintiff agreed to some repeat trigger point injections. (R.pp. 351-352).

On October 29, 2009 Plaintiff had an MRI which noted her previous disc fusion at C5-C6 without complicating features or residual stenosis, but also found that she had a left central disc herniation contact and mild to moderately deformed left ventral cord at C4-C5, with no abnormal cord signal; and a concentric disc bulge at C6-C7 that mildly narrowed the spinal canal, without cord deformity. (R.pp. 360-361). She was admitted to Roper Hospital by Dr. Rawe for an elective operation to be performed at C4-5 and perhaps at C6-7. (R.pp. 357-358). Dr. Rawe noted the following day that Plaintiff's MRI scan demonstrated that she had adjacent segment disease at C4-5 with soft disc or osteophyte in the paracentral region on the left side at C4-C5, which was a "significant change" from her MRI scan of February 2009. (R.p. 370). Plaintiff thereafter underwent surgery on October 11, 2009, with Dr. Rawe noting that Plaintiff tolerated the procedure well and was returned to the recovery room in good condition. (R.pp. 375-377). In an office note dated May 25, 2010, Dr. Rawe noted that Plaintiff's neck continued to bother her, but not as much as her low back, and that she also had "other problems including her low back and thoracic area which are



bothering her now". (R.p. 438).

## II.

### (ALJ Findings and Decision)

After a review and consideration of this medical evidence as well as Plaintiff's subjective testimony, the ALJ determined that through her date last insured (March 31, 2008) Plaintiff had the RFC to perform sedentary work limited to only lifting and carrying up to 10 pounds occasionally and lesser amounts frequently, sitting for 6 hours in an 8-hour day and standing and/or walking occasionally; she could not climb ladders, ropes or scaffolds; could only occasionally climb ramps and stairs, stoop, crouch, kneel, and crawl; never reach overhead; and was limited to simple, routine and repetitive tasks. (R.p. 626). Plaintiff argues that the ALJ performed a flawed credibility analysis in reaching these findings and conclusions. Specifically, Plaintiff argues that the ALJ relied too heavily on the objective record in making his findings, ignored the fact that either disc protrusion or osteophyes in contact with Plaintiff's spine were what caused her pain, and failed to recognize that increase in activity would send Plaintiff to the doctor's office with complaints of increase in her pain and that any increase in her functionality was due to her receiving a regimen of pain prescriptions. However, after a review of the record and evidence in this case, the undersigned can find no reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff or in assessing her credibility. Thomas v. Celebreeze, 331 F.2d 541, 543 [court scrutinizes the record as a whole to determine whether the conclusions reached are rational].

The ALJ set forth an extensive review of the case evidence, including Plaintiff's testimony as well as the objective medical evidence and the opinions of Plaintiff's physicians, in



20

explaining how he came to his decision. See generally, (R.pp. 626-632). The ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause some of the symptoms she alleged, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible for the reasons explained in the decision based on a consideration of the entire case record. (R.pp. 627, 631). This was the proper analytical framework for the ALJ to have followed in evaluating Plaintiff's subjective testimony as to the extent of her pain and limitations. See 20 C.F.R. §§ 404.1529(b)-(c); SSR 96–7p,[16] 1996 WL 374186, at *2 [Where a claimant seeks to rely on subjective evidence to prove the severity of her symptoms, the ALJ "must make a finding on the credibility of the individual's statements, based on a consideration of the entire case record."]; Mickles v. Shalala, 29 F.3d 918, 925-926 (4th Cir. 1994) [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence].

With respect to Plaintiff's complaint that the ALJ relied too heavily on the objective record in making his findings, the undersigned can find no error in the ALJ's overall evaluation of the record and evidence in this case. While Plaintiff is certainly correct that objective evidence supporting a claimant's subjective allegations is not required; cf. Lewis v. Berryhill, 858 F.3d 858, 865-866 (4th Cir. 2017)[reciting the two-step analysis for considering a claimant's subjective

---

[16]Subsequent to the ALJ's decision in this case, the Social Security Administration superseded SSR 96-7p with SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Social Security Ruling 16-3p eliminates the use of the term " 'credibility' from ... sub-regulatory policy" and "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character." Id. at *1. Because SSR 96-7p was in effect at the time of ALJ's decision, the undersigned has reviewed the decision under SSR 96-7p. See Keefer v. Colvin, 2016 WL 5539516, at *11 n.5 (D.S.C. Sept. 30, 2016). In any event, while SSR 16-3p eliminates the assessment of credibility, it still requires assessment of most of the same factors to be considered under SSR 96-7p.



statements, but finding that the ALJ's determination in that case that objective medical evidence was required to support the claimant's evidence of pain intensity improperly increased the claimant's burden of proof]; when objective evidence conflicts with a claimant's subjective statements, an ALJ is allowed to give the statements less weight. See SSR 96–7p, 1996 WL 374186, at *1; Craig v. Chater, 76 F.3d 589-590 (4th Cir. 1996) ["Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment."]. Here, the ALJ noted Plaintiff's testimony from the February 2013 hearing that after her accident in 2004 she experienced pain mainly on her left side that radiated from her neck and down her back, that she could not do anything around the house, occasionally used a walker, and that her pain level from the 2004 to 2008 period "pretty much stayed at an eight." (R.pp. 627, 705-706, 708-709). He also discussed Plaintiff's testimony from the June 2015 hearing that she was still experiencing pain despite two surgeries, that Plaintiff reported she experienced headaches due to her pain, that she could not wash dishes or do laundry because the repetitive motion exacerbated her pain, and that she experienced fatigue and medication side effects including vomiting and nausea. (R.pp. 627, 648, 653).[17] However, the ALJ

---

[17]It is noted that Plaintiff also testified that she would call Dr. Rawe to tell him that she was in pain and that the "things in her neck" were moving, and that he would call her a liar, but that after she paid for an MRI and took it to him to compare, he then called her and told her that she was right that her pins and plates were moving. (R.p. 653). As previously noted, however, there is no evidence in the medical records from the relevant time period to support this statement. See discussion, supra; see also (R.pp. 284, 292, 302, 336-337). Instead, Plaintiff appears to have been referring in this testimony to her MRI of October 2009, which Dr. Rawe noted did show "significant change" from her MRI of February 2009. (R.p. 370). However, both of those dates were well after Plaintiff's eligibility for DIB had expired.



also reviewed in some detail the medical evidence and opinions of Plaintiff's medical providers, discussing how Plaintiff experienced only moderate tenderness and spasms in the cervical area, had only mildly restricted range of motion of the cervical spine, no strength deficiencies in her upper extremities, no obvious weakness of the upper extremities, that post-operative x-rays in 2005 showed Plaintiff's fusion to be consolidating well with good position of the anterior spinal plate and no instability, Dr. Lembo's findings from 2007 that although Plaintiff had restricted range of motion of the cervical spine and shoulder, she demonstrated full motor strength and had no atrophy in her upper extremities, and that as late as February 2008 Plaintiff still had full (5/5) strength in her upper extremities with symmetric reflexes notwithstanding her reduced range of motion of the cervical spine and shoulders, suggesting she could lift up to ten pounds occasionally and lesser amounts frequently (within her RFC). See (R.p. 627-629); see also Craig, 76 F.3d at 589-590 [noting importance of treating physician opinion]; Gaskin v. Commissioner of Social Security, 280 Fed.Appx. 472, 477 (6th Cir. 2008)[Finding that evidence of no muscle atrophy and that claimant "possesses normal strength" contradicted Plaintiff's claims of disabling physical impairment];

The ALJ also noted the results of Dr. Brabham's consultative examination from April 2005, wherein he opined that, although he did not believe Plaintiff could perform full time work activity at that time, with surgery her condition could improve sufficiently for her to perform full time work, although not her previous dry-wall job. (R.pp. 220-221, 631-632). See Richardson v. Perales, 402 U.S. 389, 408 (1971) [assessments of examining, non-treating physicians may constitute substantial evidence in support of a finding of non-disability]. Of course, Plaintiff subsequently had surgery, following which her treating neurosurgeon (Dr. Rawe) noted her improved condition. The



ALJ also specifically incorporated the lifting restrictions noted by Dr. Brabham and Dr. Rawe into Plaintiff's RFC. See (R.pp. 220, 293, 626). Moreover, although the ALJ found that Plaintiff's allegations of the extent of her limitations and pain were not fully credible, the decision reflects that he nonetheless accounted for Plaintiff's pain complaints by limiting her RFC to the more restrictive level of sedentary work activity based on his review of the entire record, instead of the higher level medium work the State agency medical consultant opined that Plaintiff could perform. (R.pp. 327-334, 632). See Marquez v. Astrue, No. 08-206, 2009 WL 3063106 at * 4 (C.D.Cal. Sept. 21, 2006)[Finding no error where ALJ's RFC finding was more restrictive than the exertional levels suggested by the State Agency examiner]; cf. Muir v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave Plaintiff an even more restrictive RFC than the medical records provided].

The ALJ also specifically addressed the issues raised by the Court in its Order reversing the previous decision. The ALJ noted Dr. Campbell's records, which generally do not document any physical examination findings, including her findings from December 2007 that Plaintiff was doing well on her current pain medication regimen and was able to function, as well as her notations that Plaintiff becoming more physically active led to increased pain. (R.pp. 628-629); see (R.pp. 271, 275). The ALJ determined that Dr. Campbell's treatment notes were devoid of any findings to suggest that Plaintiff was incapable of performing the sedentary work RFC assigned in the decision, and the undersigned can discern no reversible error in this finding. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; see also Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993)

24



["What we require is that the ALJ sufficiently articulate her assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'"]..

The ALJ also specifically addressed in considerable detail the records and findings of Dr. Rawe, noting that he was giving "great weight" to Dr. Rawe's opinions. (R.pp. 628-631). See also Craig, 76 F.3d at 589-590 [Noting importance of treating physician opinions]. These records show that when Plaintiff initially saw Dr. Rawe in January 2005, her neuromuscular examination revealed only a mildly restricted range of motion of the cervical spine with no significant muscle spasm, good range of motion of the low back, there was no obvious weakness of the upper and lower extremity muscle groups, and sensation in Plaintiff's lower extremities was intact. By February 14, 2005, Dr. Rawe opined that Plaintiff would most likely have only a fifteen percent impairment of her cervical spine, with work restrictions that would include not working with her hands up over her head for a long period of time and bending her neck backwards. (R.p. 307). After Plaintiff had her cervical spine surgery in May 2005, Plaintiff's left arm pain improved to the point that it was only "intermittent", with a restricted range of motion of the cervical spine and a moderate amount of neck pain. (R.p. 291). By October 2005, Plaintiff reported that her left arm pain had markedly improved, although she would experience "pretty moderate pain" if she attempted to "drywall" or drive. (R.p. 292). In November 2005, Dr. Rawe again opined that Plaintiff had only a fifteen percent impairment of the cervical spine and to the whole body, with permanent restrictions of working with her hands up over her head for excessive periods of time and excessive hyper extension of the cervical spine. (R.p. 309). There is nothing in these findings which would preclude the sedentary RFC set forth in

25



the decision. See Waters v. Gardner, 452 F.2d 855, 858 (9th Cir. 1971) [Concluding whole person impairment rating of less than thirty (30%) percent was inconsistent with allegations of disability].

When Plaintiff returned to see Dr. Rawe in January 2006, she reported that she was able to go to the fitness center twice a week and had been working out. She also reported that she still had some neck pain and some pain in her left arm with residuals with "moderate amount of activities around the house". Dr. Rawe opined that, although Plaintiff had permanent restrictions from working with her hands up over her head and excessive bending of her neck, otherwise she was able to do other types of employment. He advised Plaintiff that she should avoid lifting more than fifteen pounds maximum, and that although she could lift ten pounds frequently, she could not do any repetitive lifting. (R.p. 293). See Craig, 76 F.3d at 589-590 [noting importance of treating physician opinion]; see also 20 C.F.R. § 404.1527(d)(5) (2001) [opinion of a specialist about medical issues related to his or her area of specialty are entitled to more weight than the opinion of a physician who is not a specialist]. Again, these findings are all consistent with the RFC set forth in the decision. See (R.p. 626). When Dr. Rawe later saw the Plaintiff in March 2009 (which was by that time a year after Plaintiff's eligibility for DIB had expired), he discussed the results of Plaintiff's MRI scan of her cervical spine with her, noting that it did not appear to demonstrate any obvious new changes such as adjacent segment disease that additional surgery would be helpful for. (R.p. 284). While Plaintiff did eventually end up having additional surgery, she did not do so until October 2009, a year and a half after her eligibility for DIB had already expired.

The ALJ also specifically addressed Plaintiff's radiographic findings, noting Plaintiff's surgery in 2005 and recurrent cervical spine pathology requiring surgery in 2009, and that



the cervical MRIs of record revealed either disc protrusion or osteophytes were in contact with Plaintiff's spinal cord. (R.p. 630). However, he gave great weight to the opinions of Dr. Rawe, as Plaintiff's treating neurosurgeon, and his interpretations of these radiological studies. Dr. Rawe indicated that Plaintiff had no adjacent segment disease and no need for surgery in February 2009, while his lifting restrictions for the relevant time period were specifically incorporated into Plaintiff's RFC. (R.p. 630); see (R.pp. 292-294). The ALJ also noted that notwithstanding the abnormal radiological findings, treatment notes during the period from Plaintiff's alleged onset through her date last insured generally reflect that, although she exhibited some restricted range of motion of the cervical spine, she retained full strength in her upper extremities. (R.p. 630). Moreover, the ALJ noted that in May 2009, Dr. Lembo did not document any objective abnormalities of the Plaintiff's cervical spine, and in July 2009, noted that although Plaintiff exhibited cervical tenderness, she had markedly improved range of motion of the cervical spine and full motor strength. (R.p. 630). Dr. Lembo specifically noted that examination of Plaintiff's upper extremities in May 2009 did not reveal any evidence of atrophy or fasciculation, that Plaintiff had no swelling or edema, and was neurologically intact. (R.p. 339). See Haynes v. Astrue, No. 09-484, 2010 WL 3377715 at * 3 (M.D.Ala. Aug. 25, 2010)["Muscle atrophy is an objective medical indication of pain and lack thereof in [Plaintiff] militates against the conclusion that [he] suffers from pain which precludes [him] from substantial gainful activity."].

The ALJ acknowledged that Plaintiff's condition could cause pain, and concluded that Plaintiff's cervical degenerative disc disease and status post fusion and her reports of neck pain after surgery limited the amount she could stand, walk, lift, carry, perform postural activities, and that she



27

could never reach overhead. (R.p. 630). However, he did not believe Plaintiff's condition to be disabling. Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) ["The mere fact that working may cause pain or discomfort does not mandate a finding of disability"]. The ALJ also did not discredit Plaintiff's subjective claims based on her inability to at times afford treatment, but based his findings on the evidence and record as a whole. (R.p. 631). Mickles, 29 F.3d at 925-926 [In assessing the credibility of the severity of reported subjective complaints, consideration must be given to the entire record, including the objective and subjective evidence].

In sum, after a review of the record and evidence in this case, the undersigned can find no reversible error in the ALJ's treatment of the subjective testimony given by the Plaintiff. While Plaintiff argues that her cervical disc disease resulted in greater limitations during the relevant time period than were found by the ALJ, it is the job of the ALJ to review and weigh what is often times conflicting evidence. See Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ, not the Court, to weigh the evidence and resolve conflicts in that evidence]; Meyer v. Astrue, 662 F.3d 700, 707 (4th Cir. 2011) ["Assessing the probative value of competing evidence is quintessentially the role of the fact finder"]. There is no indication that the ALJ improperly weighed or evaluated the evidence in this case. To the contrary, a review of the decision shows that the ALJ carefully reviewed the record in this case, both the subjective and objective evidence, in reaching his conclusions. Plaintiff simply disagrees with his findings. However, this Court may not overturn a decision that is supported by substantial evidence just because the record may contain conflicting evidence. Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; see also Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ["In

28

reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence."]. While Plaintiff points to what she considers to be evidence sufficient to support her claim of disability, she has established no reversible error in the ALJ's treatment and consideration of her subjective testimony as to the extent of her pain and limitations during the relevant time period. See Guthrie v. Astrue, No. 10–858,2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), *adopted by,* 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012)[Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision ... this Court must affirm."]; Kellough v. Heckler, 785 F.2d 1147,.1149 (4th Cir. 1986)["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted) ]; see also Thomas v. Celebreeze, 331 F.2d at 543 [court scrutinizes the record as a whole to determine whether the conclusions reached are rational]; Johnson, 434 F.3d at 653 [a reviewing court should not undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ].

There is substantial evidence in the case record to support the findings of the ALJ. See Hepp, 511 F.3d at 806[Noting that the substantial evidence standard requires even less that a preponderance of the evidence]; Hays, 907 F.2d at 1456 [If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is 'substantial evidence']. Therefore, the decision of the Commissioner should be affirmed. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001)[holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency]; Poling v. Halter, No. 00-40,

2001 WL 34630642, at * 7 (N.D.W.Va. Mar. 29, 2001)["It is the duty of the ALJ, rather than the reviewing court, to assess the evidence of record and draw inferences therefrom"].

## Conclusion

Substantial evidence is defined as " ... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. Blalock, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the time period at issue. Therefore, it is recommended that the decision of the Commissioner be **affirmed**.

The parties are referred to the notice page attached hereto.

Bristow Marchant
United States Magistrate Judge

July **31**, 2017
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

